UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CITIMORTGAGE, INC.,                 )
                                    )
          Plaintiff,                )
                                    )
     v.                             )          No. 4:09 CV 1909 DDN
                                    )
JUST MORTGAGE, INC.,                )
                                    )
          Defendant.                )

**MEMORANDUM AND ORDER**

This action is before the court on the motions of plaintiff CitiMortgage, Inc. for summary judgment as to the Group 1 Loans[1] (Doc. 75) and to exclude the opinions of defendant's expert (Doc. 167). The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 10.) Oral arguments were heard on January 24, 2012.

**I.  BACKGROUND**

On November 20, 2009, plaintiff CitiMortgage, Inc. commenced this breach of contract action against defendant Just Mortgage, Inc. (Doc. 1.) On August 2, 2010, CitiMortgage filed its first amended complaint. (Doc. 29.) In its first amended complaint, CitiMortgage alleges that Just Mortgage delivered twenty-seven loans that failed to conform to the terms of the contract and subsequently refused to cure or repurchase these loans, thereby breaching the contract. (Id.) CitiMortgage seeks damages, costs, attorney's fees, pre-judgment interest, post-judgment interest, and an order compelling Just Mortgage to perform its obligations under the contract, namely, repurchasing the twenty-seven loans at issue. (Id.)

_____

[1]Pursuant to the court's December 21, 2010 Second Amended Case Management Order, the twenty-seven loans identified in CitiMortgage's amended complaint were divided into three groups. (Doc. 45.) CitiMortgage's motion for summary judgment concerns those loans identified as the Group 1 Loans. (Doc. 75.)

## II.   MOTION TO EXCLUDE EXPERT OPINIONS

CitiMortgage moves to exclude the reports and deposition testimony of Just Mortgage's expert witness, Thomas A. Myers, from consideration. CitiMortgage argues that Myers' reports and deposition testimony are legal conclusions, irrelevant, and not based upon a reliable methodology. CitiMortgage also argues that any probative value of Myers' reports or deposition testimony would be outweighed by the significant prejudice resulting from their admission.  (Docs. 167, 168.)

Just Mortgage responds that Myers has sufficient personal experience to offer an opinion from an industry perspective.  Just Mortgage also argues that Myers' opinion is relevant to whether the contract is ambiguous and to whether CitiMortgage exercised its discretion in good faith.  Just Mortgage further argues that admission of Myers' testimony and report would not cause unfair prejudice.  (Doc. 171.)

CitiMortgage replies that the contract is not ambiguous, that it did not act in bad faith, and that Myers' opinion to the contrary is an inadmissible legal conclusion.  CitiMortgage also replies that Myers' opinion is otherwise irrelevant and not supported by a reliable foundation.  (Doc. 172.)

In his reports and deposition testimony, Myers opines that § 2(i) and § 11(ii) of the parties' contract are inconsistent and that their inconsistency creates an ambiguity regarding when CitiMortgage could demand that Just Mortgage cure or repurchase the loans.  Myers opines that, as a result, Just Mortgage was unaware that CitiMortgage could demand cure or repurchase of the loans even though Just Mortgage originated the loans in compliance with CitiMortgage's guidelines and was unaware of any defects.  Myers also opines as to the reasonableness of § 2(i) and § 11(ii) and whether CitiMortgage acted in good faith in demanding that Just Mortgage cure or repurchase the loans.  (Docs. 151-11, 168-1, 168-2, 168-3.)

In diversity cases such as this, federal law governs the admissibility of expert testimony. US Salt, Inc. v. Broken Arrow, Inc., 563 F.3d 687, 691 (8th Cir. 2009).  Under Federal Rule of Evidence 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in

- 2 -

issue," an expert opinion is admissible so long as "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702; accord Vasquez v. Colores, 648 F.3d 648, 653 (8th Cir. 2011).

The proponent of expert testimony must prove by a preponderance of the evidence that the expert is qualified and that the testimony is relevant and reliable. Khoury v. Philips Med. Sys., 614 F.3d 888, 892 (8th Cir. 2010); Fed. R. Evid. 702 advisory committee's note. An expert must explain how he arrived at his conclusions; the court may not simply take his word for it. Fed. R. Evid. 702 advisory committee's note; Thomas v. City of Chattanooga, 398 F.3d 426, 432 (6th Cir.), cert. denied, 546 U.S. 814 (2005).

Rule 702 incorporates the rulings of the Supreme Court's decisions in Kumho Tire and Daubert. Fed. R. Evid. 702 advisory committee's note. In those cases, the Supreme Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999); Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993).

The court should not apply the Daubert factors rigidly, as they cannot be applied to every expert in every case. Kumho Tire, 526 U.S. at 141-42. Moreover, Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony, and the rule remains one of admissibility rather than exclusion. Shuck v. CNH Am., LLC, 498 F.3d 868, 874 (8th Cir. 2007).

Assuming that Mr. Myers qualifies as an expert and that his opinion was drawn from a reliable basis,[2] his opinion is nonetheless inadmissible.

"[E]xpert testimony on legal matters is not admissible." S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc., 320 F.3d 838, 841 (8th Cir. 2003); accord Lakeside Feeders, Inc. v. Producers Livestock Mktg. Ass'n, 666 F.3d 1099, 1111 (8th Cir. 2012). "Unless a contract is

---

[2]As noted above, CitiMortgage also challenges the foundation supporting Myers' conclusions. See (Doc. 168 at 7; Doc. 172 at 8, 9.) Because Myers' opinion draws impermissible legal conclusions and is otherwise irrelevant, the court need not address this argument. See n.3.

deemed ambiguous or there is a term of the contract that requires an expert's explanation, it is improper for an expert to interpret or construe a contract in his opinion." Wells Fargo Bank N.A. v. LaSalle Bank Nat'l Ass'n, No. 2:08-CV-1448 JCM (RJJ), 2011 WL 743748, at *3 (D. Nev. Feb. 23, 2011); accord DP Concrete Prods., LLC v. Am. Spring Wire Corp., No. 2:08 CV 571, 2010 WL 322738, at *1 (W.D. La. Jan. 25, 2010) ("Federal courts have consistently held that expert testimony on issues of contractual interpretation is inappropriate and that such issues are reserved for the judge and jury.").

Myers' deposition testimony and report purport to make legal conclusions concerning whether CitiMortgage acted in good faith and whether the terms of the contract are inconsistent, ambiguous, and unreasonable. For example, after analyzing and interpreting the contract terms and evaluating whether the terms are reasonable, Myers' report concludes:

> The Agreement governing the relationship between Just Mortgage and CitiMortgage is clearly ambiguous and contradictory in its terms. In my opinion, from an industry perspective, Just Mortgage cannot be reasonably bound to a promise or guarantee that no fraud or misrepresentations have been made by an external party over which Just Mortgage had no control. The fact that [Citimortgage] seeks to bind Just Mortgage by such a promise or guarantee, from an industry perspective, implies the existence of an insurance agreement to which Just Mortgage never acquiesced and, regarding which, Just Mortgage was never remunerated. . . .

(Doc. 168-1 at 23.)

Because his opinions draw legal conclusions, Myers' opinion is not an admissible expert opinion. See, e.g., Emps. Reinsurance Corp. v. Mid-Continent Cas. Co., 202 F. Supp. 2d 1212, 1219 (D. Kan. 2002) (excluding the portion of an expert's opinion which concluded that "[t]he conduct of [the plaintiff] ha[d] been unreasonable and unfair and constitute[d] bad faith" because the opinion "constitute[d] an impermissible attempt to apply the law to the facts of the case to form a legal conclusion"); Shelter Mut. Ins. Co. v. Culbertson's Ltd., Inc., No. CIV. A. 97-1609, CIV. A. 97-1969, 1999 WL 135297, at *2-3 (E.D. La. Mar. 11, 1999) (excluding an expert opinion which concluded that the parties' contract

- 4 -

was ambiguous).  Beyond these legal conclusions, Myers' opinion is not relevant to this action.[3]

Therefore, Thomas A. Myers' opinions are excluded.

### III.  MOTION FOR SUMMARY JUDGMENT

CitiMortgage moves for summary judgment, arguing that the Group 1 Loans contained inaccuracies, misrepresentations, and related defects, and as such it was entitled to demand that Just Mortgage cure or repurchase them pursuant to § 11 of the contract.  CitiMortgage also argues that Just Mortgage's subsequent failure to cure or repurchase the Group 1 Loans was a breach of the contract. (Docs. 75, 76, 100, 139.)

Just Mortgage responds that § 2(i) and § 11(ii) of Form 200 and § 2202 of the CMI Manual[4] are ambiguous and conflicting regarding its liability for inaccuracies, misrepresentations, and omissions by loan applicants, appraisers, escrow agents, title companies, closers, and credit reporting agencies.  Just Mortgage also argues that CitiMortgage violated its implied duty of good faith and fair dealing and that the terms of the contract are unconscionable.  Just Mortgage further argues that it made a unilateral mistake of fact when interpreting § 2(i). (Doc. 150.)

CitiMortgage replies that there is no ambiguity concerning § 11(i), (iv), or (v), and that it is undisputed that it had the right to demand repurchase of the Group 1 Loans under these provisions independent of § 11(ii).  CitiMortgage also argues that § 2(i) and § 11(ii) of Form 200 and § 2202 of the CMI Manual are not ambiguous or conflicting because they serve different functions in the contract.  CitiMortgage further argues that its repurchase demands were made in good faith, that the

---

[3]To the extent Myers opines regarding the national economy and national mortgage practices, his opinion is not relevant to this breach of contract action and thus is excluded.  See Citimortgage, Inc. v. OCM Bancorp, Inc., No. 4:10 CV 467 CDP, 2011 WL 1594950, at *4 n.3 ("I disagree, however, that any evidence of the general state of the real estate economy in California is probative of Citimortgage's bad faith; none of this evidence is specific to Citimortgage's state of mind.").

[4]As discussed below, both of these documents were incorporated in the parties' contract. (Doc. 77 at ¶ 10.)

contract is not unconscionable, and that Just Mortgage should not be excused by any alleged unilateral mistake of fact.  (Doc. 161.)

## IV.  STATEMENT OF UNDISPUTED FACTS

### CitiMortgage's Loan Purchasing Program

CitiMortgage is in the business of purchasing closed mortgage loans from certain approved lenders, known as "correspondents," across the United States under its Loan Purchasing Program (Program).[5] (Doc. 77 at ¶ 1.)  Through the Program, CitiMortgage functions as an investor in the secondary mortgage market.  (Id. at ¶ 2.)  CitiMortgage resells some of the loans it purchases to the Federal National Mortgage Association (Fannie Mae), the Federal Home Loan Mortgage Corporation (Freddie Mac), and other investors in the secondary mortgage market.  (Id. at ¶ 3.)

In 2007, CitiMortgage purchased more than 400,000 loans from many correspondents.  (Id. at ¶ 4.)

When CitiMortgage purchases mortgage loans from correspondents, it does so pursuant to contracts entitled "Correspondent Agreement Form 200" (Form).  (Id. at ¶ 5.)  The Program and the Form are structured to account for the large number of loans CitiMortgage purchases from correspondents each year.  (Id. at ¶ 6.)  Generally, correspondents have more direct knowledge relating to the loans than CitiMortgage because the correspondents often originated the loans.  (Id. at ¶ 7.)

### Agreement between CitiMortgage and Just Mortgage

On August 4, 2005, CitiMortgage and Just Mortgage entered into a Form, as well as a DBA Addendum.  (Id. at ¶ 8; Doc. 77-3 at 1-7, 8.)  On March 17, 2006, CitiMortgage and Just Mortgage agreed to a Delegated

---

[5]To the extent Just Mortgage states that it "lacks sufficient information or knowledge to adequately respond to the alleged uncontroverted fact and therefore asserts that it is in dispute," this response is insufficient to dispute a fact for summary judgment purposes. E.D. Mo. L.R. 7-401(E); Chavers v. Shinseki, 667 F. Supp. 2d 116, 121 n.2 (D.D.C. 2009).  Similarly, Just Mortgage's bare assertions that a fact is "immaterial" do not dispute the asserted fact.  Portis v. City of Chicago, 510 F. Supp. 2d 461, 464-65 (N.D. Ill. 2007); Menasha Corp. v. News Am. Mktg. In-Store, Inc., 238 F. Supp. 2d 1024, 1029 (N.D. Ill. 2003).

Underwriting Addendum.  (Doc. 77 at ¶ 8; Doc. 77-3 at 9, 10.)  The Form,
the DBA Addendum, and the Delegated Underwriting Addendum (collectively
"Agreement") set forth the terms and conditions governing the sale of
mortgage loans by Just Mortgage to CitiMortgage under the Program.  (Doc.
77 at ¶ 10.)

The Agreement states, in relevant part:

1.   PURCHASE AND SALE OF MORTGAGE LOANS

From time to time, Correspondent may sell to CMI and CMI may
purchase from Correspondent one or more residential mortgage,
home equity or other loans ("Loan(s)") in accordance with the
terms, conditions, requirements, procedures, representations
and warranties set forth in the "CitiMortgage, Inc.
Correspondent Manual" and all amendments, bulletins, program
requirements and supplements to such Manual (collectively
hereinafter referred to as the "CMI Manual"), and this
Agreement. CMI and Correspondent agree that the CMI Manual is
incorporated by reference herein and is part of this
Agreement.  Further, CMI and Correspondent agree that
Citibank, FSB; Citibank (West), FSB; and Citibank, N.A. are
intended third party beneficiaries of this Agreement.

For each Loan offered for sale by Correspondent to CMI,
Correspondent will deliver Loan documentation to CMI in
accordance with the applicable terms, conditions,
requirements, procedures, representations and warranties set
forth in the CMI Manual.  CMI may purchase Loans with or
without conducting a complete review of the Loan
documentation.  CMI's review of, or failure to review, all or
any portion of the Loan documentation shall not affect CMI's
rights to demand repurchase of a Loan or any other CMI right
or remedy provided by this Agreement.

For each Loan CMI agrees to Purchase, CMI shall pay the amount
agreed upon by CMI and Correspondent ("Purchase Price") in
accordance with the applicable provisions of the CMI Manual.
CMI may offset against the Purchase Price any outstanding fees
or other amounts owing from Correspondent to CMI in connection
with the particular purchase or other transactions.

As of the date CMI purchases each Loan, Correspondent will
(i) transfer to CMI all of its right, title and interest in
and to each Loan, including without limitation all documents
held or subsequently acquired by Correspondent relating to
each Loan and (ii) execute all documents necessary to transfer
such right, title and interest to CMI.

2.   REPRESENTATIONS AND WARRANTIES

Correspondent represents, warrants and covenants throughout the term of this Agreement as follows:

* * *

(i) That neither this Agreement nor any statement, report or other information provided or to be provided pursuant to this Agreement (including but not limited to the statements and information contained in the documentation for each Loan purchased by CMI) contains or will contain any misrepresentation or untrue statement of fact or omits or will omit to state a fact necessary to make the information not misleading.  The provisions of this sub-section shall not apply to information obtained from (i) appraisers, escrow agents, title companies, closers, credit reporting agencies or any other entity approved by CMI ("Approved Entity") unless Correspondent knows or has reason to believe that any information provided by such Approved Entity is not true, correct or valid in any material respect and (ii) the Loan applicant(s) unless Correspondent knows, has reason to believe or, after performing its normal due diligence and quality control review, should have known that any information provided by the Loan applicant(s) is not true, correct or valid in any material respect.

* * *

11.  CURE OR REPURCHASE

If CMI, in its sole and exclusive discretion, determines any Loan purchased pursuant to this Agreement:

(i) was underwritten and/or originated in violation of any term, condition, requirement or procedure contained in this Agreement or the CMI Manual in effect as of the date CMI purchased such Loan;

(ii) was underwritten and/or originated based on any materially inaccurate information or material misrepresentation made by the Loan borrower(s), Correspondent, Correspondent's directors, officers, employees, agents, independent contractors and/or affiliates, or any other party providing information relating to said Loans;

* * *

(iv) must be repurchased from any secondary market investor (including but not limited to the Fannie Mae, Freddie Mac, FHA, VA, HUD or Government National Mortgage Association) due to a breach by Correspondent of any representation, warranty

- 8 -

or covenant contained in this Agreement or the CMI Manual or a failure by Correspondent to comply in all material respects with the applicable CMI Manual terms, conditions, requirements and procedures; and/or

(v) was subject to an Early Payment Default[6] (as defined in the CMI Manual), an Early Payoff[7] (as defined in the CMI Manual) or any other payment related defect[8] (as defined in the CMI Manual)

Correspondent will, upon notification by CMI, correct or cure such defect within the time prescribed by CMI to the full and complete satisfaction of CMI. If, after receiving such notice from CMI, Correspondent is unable to correct or cure such defect within the prescribed time, Correspondent shall, at CMI's sole discretion, either (i) repurchase such defective Loan from CMI at the price required by CMI ("Repurchase Price") or (ii) agree to such other remedies (including but not limited to additional indemnification and/or refund of a portion of the Loan purchase price) as CMI may deem appropriate. If CMI requests a repurchase of a defective Loan, Correspondent shall, within ten (10) business days of Correspondent's receipt of such repurchase request, pay to CMI the Repurchase Price by cashier's check or wire transfer of immediately available federal funds. If such defective Loan is owned by CMI at the time of repurchase by Correspondent, CMI shall, upon receipt of the Repurchase Price, release to Correspondent the related mortgage file and shall execute and

---

[6]The CMI Manual defines "Early Payment Default" as: "CitiMortgage Correspondent Lending imposes an Early Payment Default Obligation on all Correspondents pursuant to the terms and conditions contained within the Representations and Warrants." (Doc. 81-1 at 70, § 2301.) In the Representations and Warranties section of the CMI Manual, the Manual states that a Conventional Loan is in "Early Payment Default" if "any of the first four (4) payments due to CitiMortgage, or its assigns, becomes ninety (90) days or more delinquent." In the event of an Early Payment Default, the correspondent bears an obligation to repurchase the loan or indemnify CitiMortgage. (Doc. 81-1 at 59-61, § 2202.)

[7]The CMI Manual defines "Early Payoff" as: "A conventional non-conforming, conventional conforming[,] or an FHA/VA loan purchased by CitiMortgage paid-in-full within and including 90 days after the date CitiMortgage purchased the loan. CitiMortgage Correspondent Lending imposes an Early Payoff Obligation on all Correspondents pursuant to the terms and conditions contained under the Representations and Warrants." (Doc. 81-1 at 70, § 2301.)

[8]This term is not expressly defined in the CMI Manual, but appears to refer generally to "other payment related defect[s]" which themselves are defined in the CMI Manual. See (Doc. 81-1 at 68-73, § 2301.)

deliver such instruments of transfer or assignment, in each case without recourse or warranty, as shall be necessary to vest in Correspondent or its designee title to the repurchased Loan.

Correspondent agrees and acknowledges that the provisions of this Sec. 11 do not, in any way, eliminate, diminish or impair Correspondent's indemnification obligations contained in Sec. 10.

(Doc. 77 at ¶¶ 11–13; Doc. 77-3 at §§ 1, 2(i), 11.)  Section 2202 of the Correspondent Manual (Manual) states:

REPRESENTATIONS AND WARRANTIES 2202

<u>FRAUD OR MISREPRESENTATION</u>

As of the date each Loan was originated, except as qualified in section 2(i) of the Correspondent Loan Purchase Agreement, the Correspondent represents and warrants that all information relating to the Loan was complete and accurate, and contained no fraud or misrepresentation, whether the information was obtained, derived or requested by a third party or an affiliate of the Correspondent or otherwise, or by the Correspondent.

(Doc. 155-33 at 1, 2.)

The Manual is expressly incorporated into the Agreement.  (Doc. 77 at ¶ 14.)  Just Mortgage represented and warranted in the Agreement that it had obtained and reviewed the Manual and would comply with the terms, conditions, requirements, and procedures therein.  (<u>Id.</u> at ¶ 16.)

Group 1 Loans

In 2006, Just Mortgage began selling loans to CitiMortgage under the Agreement.  (<u>Id.</u> at ¶ 18.)  Since 2006, Just Mortgage has sold 3,587 mortgage loans to CitiMortgage, the principal balances of which totaled approximately $938,776,000.00.  (<u>Id.</u> at ¶ 19.)

Ten of these loans are the Group 1 Loans: (1) Beevers Loan #XXXXX4387; (2) Collins Loan #XXXXX1455; (3) Ghazarian Loan #XXXXX3095; (4) Molier Loan #XXXXX1011; (5) Mollah Loan #XXXXX0608; (6) Mohammed Loan #XXXXX7348; (7) Mohammad Loan #XXXXX1904; (8) Tirona Loan #XXXXX5975; (9) Tavares Loan #XXXXX7470; and (10) Turbeville Loan #XXXXX4160.  (<u>Id.</u> at ¶ 20.)

Purchases

On January 17, 2008, CitiMortgage purchased from Just Mortgage the Mohammed Loan #XXXXX7348 (Mohammed Loan 2), for residential property located at 3025 Greystone Loop Building 7, U 203, Kissimmee FL 35741. (Id. at ¶ 25.)

On January 18, 2008, CitiMortgage purchased from Just Mortgage the Mohammed Loan #XXXXX1904 (Mohammed Loan 1), for residential property located at 3301 Whitestone Circle, #204, Kissimmee, FL 34731.[9] (Id. at ¶ 24; Doc. 151 at ¶ 24.)

On February 29, 2008, CitiMortgage purchased from Just Mortgage the Ghazarian Loan #XXXXX3095, for residential property located at 420 Willimet Avenue, Los Angeles, CA 90039. (Doc. 77 at ¶ 23.)

On February 29, 2008, CitiMortgage purchased from Just Mortgage the Beevers Loan #XXXXX4387, for residential property located at 5085 Northwest 7th Street 703, Miami, FL 33126. (Id. at ¶ 21.)

On March 24, 2008, CitiMortgage purchased from Just Mortgage the Mollah Loan #XXXXX0608, for residential property located at 19858 Foothill Avenue, Holliswood, NY 11423. (Id. at ¶ 27.)

On March 25, 2008, CitiMortgage purchased from Just Mortgage the Molier Loan #XXXXX1011, for residential property located at 13763 Southwest 32 Street, Miami, FL 33175. (Id. at ¶ 26.)

On April 3, 2008, CitiMortgage purchased from Just Mortgage the Turbeville Loan #XXXXX4160, for residential property located at 659 Broadway Street, Venice, CA 90291. (Id. at ¶ 30.)

On April 10, 2008, CitiMortgage purchased from Just Mortgage the Tirona Loan #XXXXX5975, for residential property located at 45 Maleener Mesa Street, Building 1, Unit 111, Henderson, NV 89074. (Id. at ¶ 29.)

On May 23, 2008, CitiMortgage purchased from Just Mortgage the Collins Loan #XXXXX1455, for residential property located at 815 N. Avalon Street, Memphis, TN 38107. (Id. at ¶ 22.)

---

[9]The parties dispute whether the address is "3301 Whitestone Circle, #204, Kissimmee, FL 34741," or "3301 Whitestone Circle, Kissimmee, FL 34741." (Doc. 77 at ¶ 24; Doc. 151 at ¶ 24.) This dispute is not material for purposes of the instant motion for summary judgment. For sake of clarity, the court lists the address as "3301 Whitestone Circle, #204, Kissimmee, FL 34741."

On June 27, 2008, CitiMortgage purchased from Just Mortgage the Tavares Loan #XXXXX7470, for residential property located at 8701 Wiles Road, Unit 302, Building 16, Coral Springs, FL 33067. (Id. at ¶ 28.)

Defects[10]

After purchasing the Group 1 Loans from Just Mortgage, CitiMortgage became aware of facts indicating that information related to the borrowers' incomes and employment histories in the Group 1 Loan application packages was misrepresented or materially inaccurate, or that the Group 1 Loans were otherwise defective under the terms of the Agreement. (Id. at ¶ 32.)

Beevers Loan #XXXXX4387

After purchasing the Beevers Loan from Just Mortgage, CitiMortgage discovered that the Beevers Loan application package misrepresented the borrower's income. (Id. at ¶ 33.) After inputting the correct income, the debt-to-income ratio for the Beevers Loan exceeded the applicable underwriting guidelines. (Id. at ¶ 34.)

CitiMortgage also discovered that the mortgage insurance on the Beevers Loan had been rescinded. (Id. at ¶ 35.)

CitiMortgage was required to repurchase the Beevers Loan from Fannie Mae. (Id. at ¶ 36.)

---

[10]Just Mortgage attempts to dispute various assertions regarding Loan defects on the basis that it was unaware of the defects, that it complied with CitiMortgage's underwriting and origination guidelines, and that CitiMortgage acted in bad faith.   See (Doc. 150 at 13-19.)   These arguments do not create issues of material fact concerning the existence of Loan defects.   Therefore, these facts regarding Loan defects are treated as undisputed for purposes of the instant motion for summary judgment.

Collins Loan #XXXXX1455

After purchasing the Collins Loan from Just Mortgage, CitiMortgage discovered that there was alleged identity fraud[11] in connection with the Collins Loan application package.[12] (Id. at ¶ 38.)

CitiMortgage was required to repurchase the Collins Loan from Freddie Mac. (Id. at ¶ 39.)

Ghazarian Loan #XXXXX3095

After purchasing the Ghazarian Loan from Just Mortgage, CitiMortgage discovered that the Ghazarian Loan was subject to an Early Payment Default.[13] (Id. at ¶ 40.)

Mohammed Loan 1 #XXXXX1904

After purchasing the Mohammed Loan 1 from Just Mortgage, CitiMortgage discovered that the Mohammed Loan 1 mortgage insurance had been rescinded. (Id. at ¶ 42.)

CitiMortgage also discovered that the Mohammed Loan 1 application package misrepresented the borrower's income. (Id. at ¶ 43.)   After

---

[11]In its repurchase Demand Letter to Just Mortgage regarding the Collins Loan #XXXXX1455, CitiMortgage stated that "in researching the [Collins Loan #XXXXX1455], [CitiMortgage] discovered that the borrower has filed an identity theft claim with both [CitiMortgage] and the Memphis Police Department.  The borrower indicates that the closing documents for the subject property were forged with her name." CitiMortgage enclosed a copy of the police report and the borrower's forgery and identity theft claims with the letter. (Doc. 82-3 at 12.)

[12]CitiMortgage also asserts that it discovered that the Collins Loan application package did not contain the required documentation of a final title insurance policy. (Doc. 77 at ¶ 37.)  Just Mortgage disputes this assertion, arguing that all required documentation was provided. (Doc. 150 at 15.)  Therefore, this fact is treated as disputed.

[13]CitiMortgage also asserts that it discovered that the Ghazarian Loan application package did not contain the necessary asset verification documentation.   (Doc. 77 at ¶ 41.)   Just Mortgage disputes this assertion, arguing that it submitted all necessary documents. (Doc. 150 at 16.)  Therefore, this fact is treated as disputed.

inputting the correct income, the debt-to-income ratio for the Mohammed Loan 1 exceeded the applicable underwriting guidelines.[14]  (Id. at ¶ 44.)

CitiMortgage was required to repurchase the Mohammed Loan 1 from Freddie Mac.  (Id. at ¶ 45.)


Mohammed Loan 2 #XXXXX7348

After purchasing the Mohammed Loan 2 from Just Mortgage, CitiMortgage discovered that the Mohammed Loan 2 application package misrepresented the borrower's income.  (Id. at ¶ 46.)  After inputting the correct income, the debt-to-income ratio for the Mohammed Loan 2 exceeded the applicable underwriting guidelines.  (Id. at ¶ 47.)

CitiMortgage also discovered that the mortgage insurance for the Mohammed Loan 2 had been rescinded.  (Id. at ¶ 48.)


Molier Loan #XXXXX1011

After purchasing the Molier Loan from Just Mortgage, CitiMortgage discovered that the loan was subject to an Early Payment Default.  (Id. at ¶ 49.)

CitiMortgage also discovered that the Molier Loan application package did not include the required asset verification documentation.  (Id. at ¶ 50.)


Mollah Loan #XXXXX0608

After purchasing the Mollah Loan from Just Mortgage, CitiMortgage discovered that the Mollah Loan application package failed to disclose two other borrower mortgages.  (Id. at ¶ 51.)  After inputting the correct debt, the debt-to-income ratio for the Mollah Loan exceeded the applicable underwriting guidelines.  (Id. at ¶ 52.)

CitiMortgage also discovered that the Mollah Loan was subject to an Early Payment Default.  (Id. at ¶ 53.)

---

[14]Just Mortgage disputes the existence of a second undisclosed loan that contributed an excessive debt-to-income ratio.  (Doc. 150 at 16, 17.)  Just Mortgage has not indicated whether the non-existence of the second undisclosed loan would create a permissive debt-to-income ratio. under the applicable underwriting and origination guidelines.

Tavares Loan #XXXXX7470

After purchasing the Tavares Loan from Just Mortgage, CitiMortgage discovered that the Tavares Loan application package failed to disclose at least one other borrower mortgage. (Id. at ¶ 54.)  After inputting the correct debt, the debt-to-income ratio for the Tavares Loan exceeded the applicable underwriting guidelines. (Id. at ¶ 55.)

CitiMortgage was required to repurchase the Tavares Loan from Freddie Mac. (Id. at ¶ 56.)

Tirona Loan #XXXXX5975

After purchasing the Tirona Loan from Just Mortgage, CitiMortgage was required to repurchase the loan from Fannie Mae.[15] (Id. at ¶ 58.)

Turbeville Loan #XXXXX4160

After purchasing the Turbeville Loan from Just Mortgage, CitiMortgage discovered that the Turbeville Loan application package failed to disclose at least one other borrower mortgage. (Id. at ¶ 59.)

CitiMortgage also discovered that the Turbeville Loan application package misrepresented the borrower's income. (Id. at ¶ 60.)  After including the correct income and debt, the debt-to-income ratio for the Turbeville Loan exceeded the applicable underwriting guidelines. (Id. at ¶ 61.)

Form 1003

A borrower, or someone on behalf of the borrower, must complete a Form 1003 when applying for a residential mortgage loan. (Id. at ¶ 66.) Form 1003 expressly warns that any misrepresentation related to the information provided therein will expose the borrower to civil and criminal penalties:

---

[15]CitiMortgage also argues that it discovered that the valuation of the subject property failed to comply with the applicable guidelines. (Doc. 77 at ¶ 57.)  Just Mortgage disputes this, arguing that the appraisal was sufficient. (Doc. 150 at 20.)  Thus, this fact is treated as disputed.

IX.   ACKNOWLEDGMENT AND AGREEMENT

Each of the undersigned specifically represents to Lender and to Lender's actual or potential agents, brokers, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that: (1) the information provided in this application is true and correct as of the date set forth opposite my signature and that any intentional or negligent misrepresentation of this information contained in this application may result in civil liability, including monetary damages, to any person who may suffer any loss due to reliance upon any misrepresentation that I have made on this application, and/or in criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Sec. 1001, et seq.; . . . .

(Id. at ¶ 67; Doc. 82-2 at 4.)   Each of the Group 1 Loans had a corresponding Form 1003.  (Doc. 77 at ¶ 68; Doc. 82-2.)

CitiMortgage's Demands for Cure or Repurchase

CitiMortgage found that the inaccuracies, misrepresentations, and other defects in the Group 1 Loans were defects material to the origination and underwriting decisions for each of the Group 1 Loans. (Doc. 77 at ¶ 62.)   Failure to disclose the borrower's liabilities and to ensure that the borrower's loan complies with the Agreement renders the borrower's debt-to-income ratio inaccurate and misleading to CitiMortgage.  (Id. at ¶¶ 63, 64.)   This impairs CitiMortgage's ability to assess accurately the risks associated with loans, including the ability to collect payments from the borrower.  (Id.)   Just Mortgage's promises and warranties under the Agreement that these defects were not present and its promise to cure or repurchase any loan where such defects were present were material to CitiMortgage's decision to purchase the Group 1 Loans from Just Mortgage.  (Id. at ¶ 65.)

Based on the information obtained by CitiMortgage concerning the inaccuracies, misrepresentations, and other defects in the Group 1 Loans, CitiMortgage, in its sole and exclusive discretion, determinated that the Group 1 Loans were underwritten and/or originated based on materially inaccurate information, material misrepresentations, or were otherwise in violation of the Agreement.  (Doc. 77 at ¶ 69.)

- 16 -

CitiMortgage sent written notices to Just Mortgage advising of the Group 1 Loans' defects and demanding that Just Mortgage cure the defects or repurchase the Group 1 Loans pursuant to the Agreement (Demand Letters).  (Doc. 77 at ¶ 70; Doc. 82-3.)  Just Mortgage failed to cure the defects in the Group 1 Loans or to repurchase the Group 1 Loans in response to CitiMortgage's Demand Letters.  (Doc. 77 at ¶ 72.)

As a result, CitiMortgage issued final notices to Just Mortgage demanding that Just Mortgage repurchase the Group 1 Loans (Repurchase Letters).  (Id. at ¶ 73; Doc. 83-1.)  To date, Just Mortgage has not repurchased any of the Group 1 Loans.  (Doc. 77 at ¶ 75.)

Repurchase Prices

The CMI Manual defines the Repurchase Price as:

**REPURCHASE PRICE:** The Repurchase Price is defined as the sum of: (i) the current principal balance on the loan as of the paid-to date; (ii) the accrued interest calculated at the mortgage loan Note rate from the mortgage loan paid-to date up to and including the repurchase date; (iii) all unreimbursed advances (including but not limited to tax and insurance advances, delinquency and/or foreclosure expenses, etc.) incurred in connection with the servicing of the mortgage loan; (iv) any price paid in excess of par by CitiMortgage on the funding date[;] and (v) any other fees, costs, or expenses charged by or paid to another investor in connection with the repurchase of the mortgage loan from such investor but only to the extent such fees, costs and expenses exceed the total of items (i) through (iv) above.

(Doc. 77 at ¶ 77; Doc. 81-1 at 73, § 2301.)

Based on the application of this Repurchase Price formula, the amounts due to CitiMortgage from Just Mortgage, if Just Mortgage was obligated to repurchase the Group 1 Loans,[16] would be:

| | |
|---|---|
| Beevers Loan: | $335,360.96 |
| Collins Loan: | $148,785.72 |
| Ghazarian Loan: | $351,544.46 |
| Mohammed Loan 1: | $258,607.77 |
| Mohammed Loan 2: | $188,467.10 |
| Molier Loan: | $760,876.63 |
| Mollah Loan: | $823,653.42 |

---

[16]Just Mortgage disputes only that it is not required to repurchase the Group 1 Loans; Just Mortgage does not challenge the amounts of the Repurchase Prices derived from CitiMortgage's application of the Repurchase Price formula to the Group 1 Loans.  (Doc. 151 at ¶¶ 78-88.)

```
Tavares Loan:          $237,948.05
Tirona Loan:           $168,399.17
Turbeville Loan:       $320,078.34
Total:                 $3,593,721.62
```

(Doc. 77 at ¶¶ 78-88.)  In addition, § 10 of the Agreement states:

10.  INDEMNIFICATION

Correspondent agrees to indemnify and hold CMI harmless from
any and all claims, actions and costs, including reasonable
attorneys' fees and costs, arising from (i) Correspondent's
performance or failure to perform under the terms, conditions
or obligations of this Agreement or the CMI Manual (including
but not limited to Correspondent's failure to timely deliver
all documents and records associated with or related to all
Loans purchased by CMI pursuant to this Agreement), (ii) any
fraud, misrepresentation or breach of any misrepresentation,
warranty or covenant contained [in] this Agreement or the CMI
Manual and/or (iii) Correspondent's advertisements, promotions
or other activities.  This indemnification shall extend to any
action or inaction by the directors, officers, employees,
agents, independent contractors or other representatives of
Correspondent and shall survive the expiration and termination
of this Agreement.

(Id. at ¶ 89; Doc. 77-3 at § 10.)  CitiMortgage either is the current
holder of the Group 1 Loans or was the holder at the time it demanded
repurchase of the Group 1 Loans and exercised its rights under § 11 of
the Agreement.  (Doc. 77 at ¶ 31.)

## V.  MOTION FOR SUMMARY JUDGMENT STANDARD

Summary judgment must be granted when the pleadings and proffer of
evidence demonstrate that no genuine issue of material fact exists and
that the moving party is entitled to judgment as a matter of law.  Fed.
R. Civ. P. 56(c); Celotex Corp. v. Citrate, 477 U.S. 317, 322 (1986);
Ashanti v. City of Golden Valley, 666 F.3d 1148, 1150 (8th Cir. 2012).
The court must view the evidence in the light most favorable to the
nonmoving party and accord it the benefit of all reasonable inferences.
Ashanti, 666 F.3d at 1150.  A fact is "material" if it could affect the
ultimate disposition of the case, and a factual dispute is "genuine" if
there is substantial evidence to support a reasonable jury verdict in

- 18 -

favor of the nonmoving party.  Die-Cutting Diversified, Inc. v. United Nat'l Ins. Co., 353 F. Supp. 2d 1053, 1054-55 (E.D. Mo. 2004).

Initially, the moving party must demonstrate the absence of an issue for trial.  Celotex, 477 U.S. at 323.  Once a motion is properly made and supported, the nonmoving party may not rest upon the allegations in its pleadings or general denials of the movant's assertions, but must instead proffer admissible evidence that demonstrates a genuine issue of material fact.  Fed. R. Civ. P. 56(e); Howard v. Columbia Pub. Sch. Dist., 363 F.3d 797, 800 (8th Cir.), cert. denied, 543 U.S. 956 (2004); Krein v. DBA Corp., 327 F.3d 723, 726 (8th Cir. 2003); Essex Ins. Co. v. Stone, No. 1:09 CV 1 SNLJ, 2010 WL 330328, at *2 (E.D. Mo. Jan. 21, 2010).


## VI.  DISCUSSION

### A.  Breach of Contract

The Agreement states it is governed by Missouri and applicable federal law. (Doc. 77-3 at § 12.)  Under Missouri law, a plaintiff must establish four elements to prevail on a breach of contract claim: (1) the existence of a valid contract; (2) the defendant's obligation under the contract; (3) a breach by the defendant of that obligation; and (4) resulting damages.  C-H Bldg. Assocs., LLC v. Duffey, 309 S.W.3d 897, 899 (Mo. Ct. App. 2010).

Just Mortgage does not dispute the existence of a valid contract with CitiMortgage, namely, the Agreement.  Nor does Just Mortgage contest that the Agreement sets forth the terms and conditions governing the sale of mortgage loans by Just Mortgage to CitiMortgage under the Program. Just Mortgage does not dispute that under the Agreement, CitiMortgage has the ability to "exercise its sole and exclusive discretion" to determine whether the Group 1 Loans are defective, nor does Just Mortgage dispute

that, for one reason or another,[17] each of the loans was defective.[18]  Just Mortgage does not contest CitiMortgage's damages calculations.

Instead, Just Mortgage argues that certain affirmative defenses shield it from liability.

## B.  Affirmative Defenses

Just Mortgage argues that the Agreement should not be enforced because the Agreement contains ambiguous and conflicting terms.  Just Mortgage also argues that CitiMortgage violated the implied covenant of good faith and fair dealing and that the Agreement is unconscionable.  Just Mortgage further argues that it made a unilateral mistake of fact.

### 1.  Ambiguity

A contract is ambiguous where reasonable people could fairly and honestly differ in the reading of the terms because the terms are susceptible of more than one interpretation.  Yerington v. La-Z-Boy, Inc., 124 S.W.3d 517, 520 (Mo. Ct. App. 2004); accord Kastendieck v. Millers Mut. Ins. Co., 946 S.W.2d 35, 39 (Mo. Ct. App. 1997) ("An

---

[17]As noted in the facts above and discussed in greater detail below, while Just Mortgage contests certain allegations of the existence Loan defects, it does not argue that any of the loans were entirely free of defects.

[18]Just Mortgage's argument that it followed CitiMortgage's guidelines and the guidelines incorporated therein from Fannie Mae and Freddie Mac is not determinative of whether CitiMortgage properly demanded that Just Mortgage cure or repurchase the loans because § 11(i), (ii), and (v) are not based on Just Mortgage's noncompliance with guidelines or knowledge of defects; CitiMortgage can demand that Just Mortgage cure or repurchase the loans under § 11(i), (ii), and (v) irrespective of whether Just Mortgage complied with the guidelines in originating the loans and regardless of whether Just Mortgage had no knowledge of any loan defects. See Citimortgage, Inc. v. OCM Bancorp, Inc., No. 4:10 CV 467 CDP, 2011 WL 1594950, at *5 (E.D. Mo. Apr. 27, 2011) (recognizing that "there is no qualifying language indicating . . . that Citimortgage can only demand repurchase if it determines that [the correspondent] knew of the borrower's misrepresentation" and that "[t]he Cure or Repurchase clause by its plain terms allows Citimortgage to demand repurchase at any time if it discovers a borrower's material misrepresentation, even if [the correspondent] complied with Citimortgage's guidelines when originating the loan").

- 20 -

ambiguity exists where there is duplicity, uncertainty or indistinctness in the meaning of the words used."). In addition, "if language which appears plain considered alone conflicts with other language in the contract, or if giving effect to it would render other parts of the contract a nullity, then [the court should] find the contract to be ambiguous." Zeiser v. Tajkarimi, 184 S.W.3d 128, 133 (Mo. Ct. App. 2006). Similarly, "language which promises something in one point and takes it away in another is ambiguous." Kastendieck, 946 S.W.2d at 39. In construing a contract, the court should "attribut[e] a reasonable meaning to each phrase and clause, and harmoniz[e] all provisions of the agreement" rather than "leave[] some of the provisions without function or sense." Teets v. Am. Fam. Mut. Ins. Co., 272 S.W.3d 455, 467 (Mo. Ct. App. 2008) (citation omitted). Whether or not a contract is ambiguous is a question of law for the court to decide. Id. at 462.

Just Mortgage argues that § 2(i) and § 11(ii) of the Form and § 2202 of the Manual, all of which are incorporated into the Agreement,[19] are ambiguous and conflicting regarding Just Mortgage's liability for misrepresentations, misstatements, and omissions made by loan applicants, appraisers, escrow agents, title companies, closers, and credit reporting agencies. Specifically, Just Mortgage argues that § 2(i) and § 2202 state that Just Mortgage, after conducting its normal due diligence, is not liable for any such misrepresentations, misstatements, or omissions, so long as it had no reason to believe that such a misrepresentation, misstatement, or omission existed. Just Mortgage argues that § 11(ii) is conflicting in that it states that Just Mortgage is liable to repurchase loans originated or underwritten based on such a misrepresentation, misstatement, or omission upon CitiMortgage deciding that a misrepresentation, misstatement, or omission was made, regardless of Just Mortgage's lack of any prior knowledge of the misrepresentation, misstatement, or omission. More succinctly, Just Mortgage argues that § 2(i) and § 2202 state that Just Mortgage is not liable so long as it

---

[19]"In Missouri, matters incorporated into a contract by reference are as much a part of the contract as if they had been set out in the contract in *haec verba*." Livers Bronze, Inc. v. Turner Constr. Co., 264 S.W.3d 638, 643 (Mo. Ct. App. 2008) (citation omitted).

did not have reason to believe a misrepresentation existed, while § 11(ii) states that Just Mortgage is liable regardless of Just Mortgage's lack of any prior knowledge of a misrepresentation.

Just Mortgage misconstrues the Agreement. Section 2(i) and § 2202 are representation and warranty sections, the terms of which are limited to each subsection. Section 2(i) and § 2202 are breached when a correspondent knows or should have known that loan documents contain misstatements, misrepresentations, or omissions but nonetheless submits the defective documents to CitiMortgage. Section 11(ii) sets forth one set of circumstances in which CitiMortgage can demand a correspondent cure or repurchase a loan, specifically, upon CitiMortgage determining that the loan was underwritten or originated based on a misstatement, misrepresentation, or omission. Section 11(ii) is breached when a correspondent fails to cure or repurchase the loan, and applies regardless of the correspondent's knowledge.[20]

That § 2(i) and § 2202 are limited to those instances where the correspondent knows or should have known of the misstatement, misrepresentation, or omission does not conflict or create an ambiguity when read with § 11(ii). Citimortgage, Inc. v. OCM Bancorp, Inc., No. 4:10 CV 467 CDP, 2011 WL 1594950, at *5 (E.D. Mo. Apr. 27, 2011) (discussed below); cf. Roy A. Elam Masonry, Inc. v. Fru-Con Constr. Corp., 922 S.W.2d 783, 790 (Mo. Ct. App. 1996) (finding no conflict or ambiguity among various contract sections).

Recently, in Citimortgage v. OCM Bancorp, the court rejected an argument that § 11(ii) was unenforceable because Citimortgage's guidelines did not require the correspondent to verify the borrower's income and because the correspondent was unaware of any defects in the loans when it sold them to Citimortgage:

> OCM responds with evidence suggesting that it complied
> with all of Citimortgage's underwriting requirements at the

---

[20]The remedies available for breach of § 2(i) also differ from those available for a breach of § 11(ii). Remedies for a breach of § 2(i) are set forth in § 10, while the available remedies for a breach of § 11(ii) are CitiMortgage's ability to demand that the correspondent cure or repurchase the defective loan and any other such remedies as CitiMortgage deems appropriate. (Doc. 77-3 at §§ 2, 10, 11.)

time the loan was originated, including the requirement that borrower income not be verified for this type of loan. With this evidence, OCM seems to argue . . . that it could not have detected any buyer misrepresentations at the time of loan origination, because it complied with Citimortgage's guidelines, which did not require income verification. **In other words, OCM argues that it did not breach the parties' agreement by selling this loan to Citimortgage, because, even if the borrower significantly misstated his income, Citimortgage's applicable loan guidelines did not require OCM to verify the borrower's income, and so it could not have been aware of any defect when it sold Citimortgage the loan.**

**This is not a proper interpretation of the parties' agreement.** OCM confuses the situations under which Citimortgage could demand repurchase. Rather than only allowing Citimortgage to demand repurchase if OCM originated the loan in violation of the parties' agreement, the agreement's Cure or Repurchase provision also allowed Citimortgage to demand repurchase if the loan contained material misrepresentations by the borrower and/or underwriter. . . . Thus, the parties' agreement allowed Citimortgage to demand repurchase in several situations, including if it discovered a borrower's material misrepresentation, or if it determined OCM or its agent originated the loan in violation of Citimortgage's requirements.

Moreover, with respect to the clause allowing Citimortgage to demand repurchase based on a borrower's material misrepresentations, **there is no qualifying language indicating, for example, that Citimortgage can only demand repurchase if it determines that OCM knew of the borrower's misrepresentation. The Cure or Repurchase clause by its plain terms allows Citimortgage to demand repurchase at any time if it discovers a borrower's material misrepresentation, even if OCM complied with Citimortgage's guidelines when originating the loan.**

2011 WL 1594950, at *5 (E.D. Mo. Apr. 27, 2011) (emphasis added); see also Residential Funding Corp. v. Gen. Mortg. Corp., No. CIV 00-824 DSD FLN, 2001 WL 228415, at *4 (D. Minn. Mar. 2, 2001) (holding that similar contract language "unambiguously reflect[ed] that defendant expressly agreed to repurchase the . . . loan upon plaintiff's request").

Moreover, even if §§ 2(i), 2202, and 11(ii) were ambiguous when read together, CitiMortgage was entitled to demand cure or repurchase under other subsections of § 11.

CitiMortgage was required to repurchase the Beevers, Collins, Mohammed 1, Tavares, and Tirona Loans from Fannie Mae and Freddie Mac. (Doc. 77 at ¶¶ 36, 39, 45, 56, 58.)  Thus, CitiMortgage was entitled to demand Just Mortgage cure or repurchase these loans under § 11(iv).

Regarding the Ghazarian, Molier, and Mollah Loans, each of these loans was subject to an Early Payment Default. (Id. at ¶¶ 40, 49, 53.) Thus, CitiMortgage was entitled to demand Just Mortgage to cure or repurchase these loans under § 11(v).

As to the Mohammed Loan 2, the mortgage insurance, which was required to be maintained under the terms of the Agreement, was rescinded. (Id. at ¶ 48.)  Thus, CitiMortgage's demand that Just Mortgage cure or repurchase this loan was proper under § 11(i).

Regarding the Turbeville Loan, the misrepresentations made concerning the borrower's income and the failure to disclose at least one additional mortgage caused the debt-to-income ratio on the loan to exceed applicable underwriting guidelines. (Id. at ¶¶ 59-61.)   Thus, CitiMortgage was permitted to demand Just Mortgage cure or repurchase this loan pursuant to § 11(i).

In sum, § 2(i) and § 2202[21] of the Form do not conflict with § 11(ii) of the Manual.  Moreover, as discussed above, any conflict or ambiguity in these sections would not alter the propriety of CitiMortgage's repurchase demands because CitiMortgage was entitled to demand cure or repurchase under other subsections of § 11.

## 2.   Implied Covenant of Good Faith and Fair Dealing

Just Mortgage also argues that CitiMortgage failed to act in good faith in exercising its sole and exclusive discretion to demand cure or repurchase of the Group 1 Loans, thus violating the implied covenant of good faith and fair dealing.  Just Mortgage argues that CitiMortgage knew that its guidelines, which Just Mortgage was required to comply with

---

[21]Despite citing § 2202 as a source of conflict and ambiguity, Just Mortgage makes no arguments specific as to this section, instead focusing on § 2(i) and § 11(ii).  (Doc. 150 at 7-21.)

under the Agreement, would result in defective loans, yet CitiMortgage did not notify Just Mortgage of this problem.[22]

"Missouri law implies a covenant of good faith and fair dealing in every contract." Farmers' Elec. Coop., Inc. v. Mo. Dep't of Corr., 977 S.W.2d 266, 271 (Mo. 1998) (en banc). This includes "where a contract confers on one party a discretionary power affecting the rights of the other." City of St. Joseph v. Lake Contrary Sewer Dist., 251 S.W.3d 362, 369 (Mo. Ct. App. 2008). Where one party has discretionary power, the covenant precludes exercise of that power "to deprive the other party of the benefit of the contractual relationship or evade the spirit of the bargain." Id. at 370; accord BJC Health Sys. v. Columbia Cas. Co., 478 F.3d 908, 914 (8th Cir. 2007). Consequently, "the question is not whether the party made an erroneous decision" but rather "whether the decision was made in bad faith or was arbitrary or capricious so as to amount to an abuse of discretion." Mo. Consol. Health Care Plan v. Cmty. Health Plan, 81 S.W.3d 34, 48 (Mo. Ct. App. 2002).

CitiMortgage's knowledge concerning market conditions and the efficacy of its guidelines does not implicate whether it exercised its discretion to demand cure or repurchase of the Group 1 Loans in good faith. "To establish a breach of the covenant of good faith and fair dealing, [Just Mortgage]'s burden is to establish that CitiMortgage exercised a judgment **conferred by the express terms of the agreement** in such a manner as to evade the spirit of the transaction or so as to deny [Just Mortgage] the expected benefit of the contract." CitiMortgage, Inc. v. First Cal. Mortg. Co., No. 4:10 CV 1498 RWS (E.D. Mo. Nov. 29, 2011) (Doc. 70 at 3, 4) (emphasis in original); see also Cordry v. Vanderbilt Mortg. & Fin., Inc., 370 F. Supp. 2d 923, 930 (W.D. Mo. 2005) (noting that under Missouri law, the implied covenant of good faith and fair dealing "does not impose a limitless duty or obligation and cannot

---

[22]Just Mortgage does not argue that CitiMortgage acted in bad faith because the loans were not defective, nor does the record suggest that such argument would have merit. See Citimortgage, Inc. v. OCM Bancorp, Inc., No. 4:10 CV 467 CDP, 2011 WL 1594950, at *1 (E.D. Mo. Apr. 27, 2011) (noting that the correspondent could establish bad faith "by presenting sufficient evidence of no defects at all in the six loans").

override the express terms of the agreement") (citation omitted).  Just Mortgage could satisfy its burden by showing that CitiMortgage erroneously determined that the Group 1 Loans contained defects, as this could indicate, for example, that CitiMortgage sought to terminate its contract with Just Mortgage or to push costs of the Group 1 Loans onto Just Mortgage.[23]  OCM Bancorp, 2011 WL 1594950, at *4.  However, "there can be no bad faith if [CitiMortgage] simply performed the actions expressly granted it by the parties' agreement, including determining that loans were defective and needed to be repurchased."  Id.; see also id. at *4, n.3 (rejecting the argument that "evidence of the real estate economy . . . is probative of [CitiMortgage]'s bad faith); accord First Cal., No. 4:10 CV 1498 RWS (Doc. 70 at 2-4).  Just Mortgage's argument does not concern the validity of or motivation behind CitiMortgage's exercise of discretion in demanding cure or repurchase.

Therefore, Just Mortgage has not raised a colorable defense of breach of implied covenant of good faith and fair dealing.

### 3.  Unconscionability

Just Mortgage also argues that the terms of the Agreement are unconscionable and should not be enforced.  In support of its unconscionability argument, Just Mortgage asserts that CitiMortgage had superior bargaining power; that Just Mortgage was not aware of all of the situations in which CitiMortgage could demand that Just Mortgage cure or repurchase loans; that Just Mortgage was forced to accept the terms of the Agreement as-is; and that the terms of the Agreement are one-sided.

Just Mortgage did not plead unconscionability as an affirmative defense in its answer.[24]  (Doc. 30.)  Thus, Just Mortgage has waived this defense.  Fed. R. Civ. P. 8(c); e.g., Med. Shoppe Int'l, Inc. v. Plunkett Drug, Inc., No. 4:04 CV 699 DJS, 2005 WL 23333894, at *2 (E.D. Mo. Sept.

---

[23]Just Mortgage does not argue that the Group 1 Loans contained no defects at all, such that CitiMortgage's demands to cure or repurchase the loans were erroneous.

[24]Just Mortgage did, however, raise thirty-five other affirmative defenses in its answer.  (Doc. 30.)

22, 2005).  Just Mortgage's unconscionability defense also fails on its merits.

Missouri courts have adopted the doctrine of unconscionability "to guard against one-sided contracts, oppression, and unfair surprise." Cowbell, LLC v. Borc Bldg. & Leasing Corp., 328 S.W.3d 399, 405 (Mo. Ct. App. 2010).  Unconscionability can be procedural, substantive, or a combination of both.  Id.  Unconscionability is evaluated "in view of the circumstances in which the contract was made."  Id.

Just Mortgage asserts that CitiMortgage "bullied a much less sophisticated company into accepting a patently one-sided contract." (Doc. 150 at 30.)  Since 2006, however, Just Mortgage has sold 3,587 mortgage loans to CitiMortgage, the principal balances of which totaled nearly *one billion dollars* (approximately $938,776,000.00).  (Doc. 77 at ¶ 19.)  Just Mortgage's own sophistication belies its argument that it was forced to enter into an unfavorable contract.  See Pro Tech Indus., Inc. v. URS Corp., 377 F.3d 868, 873 (8th Cir. 2004) (rejecting an unconscionability argument under Texas law where the parties "were both businesses holding themselves out as sophisticated enough to negotiate a $471,071 government construction contract"); In re Am. Eagle Coatings, Inc., 353 B.R. 656, 663 (Bankr. W.D. Mo. 2006) (noting that Missouri courts are reluctant to find unequal bargaining power in a contract between sophisticated commercial parties).

Moreover, while the Agreement permits CitiMortgage to demand that Just Mortgage cure or repurchase loans for a variety of reasons, "[s]ophisticated parties have freedom of contract—even to make a bad bargain, or to relinquish fundamental rights."  Purcell Tire & Rubber Co., Inc. v. Exec. Beechcraft, Inc., 59 S.W.3d 505, 508 (Mo. 2001) (en banc); cf. Union Elec. Co. v. Sw. Bell Tel. L.P., 378 F.3d 781, 789 (8th Cir. 2004) (rejecting an unclean hands argument because "[w]here two sophisticated commercial enterprises allocate their risk of loss by contract as between them, no public policy is violated").  That Just Mortgage was ultimately required to repurchase the Group 1 Loans does not make the Agreement unconscionable.  See Kleinheider v. Phillips Pipe Line Co., 528 F.2d 837, 842 (8th Cir. 1975) (explaining that a court will not

set aside a contract simply because, in hindsight, it has become a bad bargain).

Therefore, Just Mortgage's unconscionability defense fails both because it was not pleaded as an affirmative defense and on its merits.

### 4. Unilateral Mistake of Fact

Just Mortgage also argues that it mistakenly believed that if it complied solely with § 2(i), then CitiMortgage would not be able to demand cure or repurchase of the Group 1 Loans based on loan applicants' misrepresentations. Just Mortgage asserts that it would not have entered into the Agreement had it known otherwise.

To establish a unilateral mistake of fact defense, a party must show that the mistake was either known to the other party, the mistake was so obvious that it must have been known, or that the effect of the mistake is such that enforcement would be unconscionable. Landers v. Sgouros, 224 S.W.3d 651, 664 (Mo. Ct. App. 2007); Boston v. Sec. Fed. Sav. & Loan Ass'n, 877 F.2d 696, 697 (8th Cir. 1989). Missouri courts "are extremely reluctant to permit one party to avoid an agreement because of a mistake not shared by the other party to the contract." Harris v. A.G. Edwards & Sons, Inc., 273 S.W.3d 540, 543 n.3 (Mo. Ct. App. 2008).

Just Mortgage has not presented evidence that CitiMortgage knew that Just Mortgage misinterpreted the Agreement,[25] or that Just Mortgage's misinterpretation was so obvious that CitiMortgage must have known. Nor, as discussed above, is enforcement of the Agreement unconscionable.

Therefore, Just Mortgage's unilateral mistake of fact defense also fails.

### VII.  CONCLUSION

For the reasons stated above,

**IT IS HEREBY ORDERED** that the motion of plaintiff CitiMortgage, Inc. to exclude the expert opinions of Thomas A. Myers (Doc. 167) is sustained.

---

[25]This assumes, *arguendo*, that Just Mortgage misinterpreted the Agreement.

- 28 -

**IT IS FURTHER ORDERED** that the motion of plaintiff CitiMortgage, Inc. for summary judgment as to the Group 1 Loans (Doc. 75) is sustained.


_____/S/___David D. Noce_____
**UNITED STATES MAGISTRATE JUDGE**

Signed on March 29, 2012.